IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

F I L E D

03 DEC 30  AM 11: 46

U.S. DISTRICT COURT
N.D. OF ALABAMA

SARITA WASHINGTON,                  )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )    CIVIL ACTION NO. 02-JEO-0645-S
                                    )
BELLSOUTH TELECOMMUNICATIONS,       )
INC., et al.,                       )
                                    )
        Defendants.                 )

**ENTERED**

DEC 3 0 2003

### MEMORANDUM OPINION

This matter is before the court on the motion of Defendants BellSouth

Telecommunications, Inc. (hereinafter "BellSouth"), Kemper National Services, Inc. (hereinafter

"Kemper"), the BellSouth Short Term Disability Plan (hereinafter "STD Plan"), the BellSouth

Long Term Disability Plan (hereinafter "LTD Plan"), the BellSouth Health Insurance and Dental

Insurance Plan, and the BellSouth Pension Plan (hereinafter collectively "the defendants") for

summary judgment. (Doc. 13). Oral argument on the motion was conducted on December 17,

2003. Upon consideration, the court finds that the motion is due to be denied.

### BACKGROUND FACTS[1]

Plaintiff Sarita Washington (hereinafter "the plaintiff") filed her complaint on March 13,

2002, alleging that Defendant BellSouth Telecommunications had wrongfully denied her benefits

under BellSouth's STD and LTD Plans. (Doc. 1).[2] The plaintiff was permitted to amend her

---

[1] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[2] References herein to "Doc. ___" are to the document numbers assigned the pleadings by the Clerk of the Court.

23

complaint on August 5, 2002, to add the other defendants listed above. (Doc. 11). The parties

agree that the Plans at issue in this action are controlled by the Employee Retirement Income

Security Act (29 U.S.C. § 1001, et seq.) (hereinafter "ERISA").

The plaintiff began working for BellSouth in about 1979. She formerly worked there as a

service representative until her separation therefrom. She was a participant in the BellSouth STD

and LTD Plans.

STD benefits are paid from the operating expenses of BellSouth. Payment is not

contingent upon sufficient funds being available in a trust account. Instead, payments are made

by BellSouth's payroll department for each pay period. BellSouth has delegated claims

administration to Kemper. Kemper determines eligibility for benefits premised upon the

definition of a disability as provided in the STD Plan. It provides:

> "Disability" means a medical condition which makes a Participant unable to
> perform any type of work as a result of a physical or mental illness or an
> accidental injury. "Any type of work" includes the Participant's regular job with
> or without accommodations, any other Participating Company job (regardless of
> availability) with or without accommodations, or temporary modified duties. "A
> Participating Company job" is any job within a Participating Company; or any job
> outside a Participating Company which is comparable in skills and functions. A
> Participant subject to a Disability is referred to as being "Disabled."

(Pl. Ex. 11 at 3123).[3] The LTD Plan defines a disability as "a physical or mental illness, whether

work-related or non-work related, which makes a Participant who has been covered under the

Short Term Disability Plan for 52 weeks unable to perform any type of work other than one

which pays less than half of his base pay at the time his benefits under the Short Term Disability

Plan begin." (Pl. Ex. 12 at 3147).

---

[3] The plaintiff's exhibits are located at document 17. The reference to the page number is to the "Bates Number" located in the lower right-hand corner.

The plaintiff has a history of rheumatoid arthritis.  On or about February 2, 2001, the plaintiff stopped reporting to work.  She filed a request for STD benefits on February 7, 2001. (Marisol Vega Dep. (hereinafter "Vega Dep." at 14)).[4]  The plaintiff's claim was assigned to a case manager, Dorothy Barnes.  (Vega Dep. at 17).  Her claim was premised in part on the report of Daniel Holden, M.D., a rheumatologist.  (*Id.* at 18).  The report states that the plaintiff suffered from rheumatoid arthritis; that she had synovitis hands and methotrexate pheumonitis; that she was on medication; and, that she would not be able to work.  (Def. Ex. C at 0105).

Kemper declined to direct the payment of benefits for the plaintiff on February 20, 2001. It was effective as of February 9, 2001.  (Def. Ex. C at 0051; Vega Dep. at 19).[5]  A computer entry by a Kemper supervisor, Eileen Joseph states that "although the labwork [sic] confirms the [diagnosis], I also do not see any specific objective data . . . .  I also note no [return to work yet]. Denial approved.  Please advise the patient and employer. . . ."  (*Id.*; Vega Dep. at 23).  The plaintiff was informed that the medical information did not support a finding of a disability.  (*Id.* at 0106-07; Vega Dep. at 19).  Following the submission of additional medical information from Dr. Holden, benefits again were denied.  (*Id.* at 0108; Vega Dep. at 25).  Kemper's notations state that if the plaintiff's functional capacity evaluation (hereinafter "FCE") demonstrates she was unable to work, then she might be eligible for benefits.  (*Id.*).

Kemper was informed in a March 2, 2001, telephone conversation that the plaintiff was being terminated.  (*Id.* at 0109; Vega Dep. at 31-32).  During the conversation, representatives of BellSouth requested that an independent medical examination be conducted.  (Vega Dep. at 33-

---

[4] Vega's deposition is found in the record with the plaintiff's submissions at exhibit 15.

[5] The defendants' exhibits are located at document 14.  The page numbers are references to the "Bates" numbers in the lower right-hand corner.

35). On the same date, Kemper requested that Dr. Holden forward the FCE results for review.
(Def. Ex. C at 0108). The February 14-15, 2001, FCE results were submitted on March 9, 2001.
(*Id*. at 0110). The report states that the plaintiff could report to work in a limited capacity. (*Id*.).

Kemper scheduled a physiatric evaluation with Leigh Henderson, M.D. It was conducted
on March 23, 2001. The report was received about April 2, 2001, and it confirmed the arthritis
diagnosis. (Vega Dep. at 38). Kemper's claim entry concerning the evaluation provides as
follows:

> Patient's flare of her rheumatoid arthritis and degree of synovitis along with her
> deformities are in the moderately severe category; she is at this point unable to
> work even a part time job which requires the use of her hands. She may be able to
> do some work for short periods of time using a mouse at a computer, although she
> still would need some wrist support and hands [sic] support and need frequent rest
> breaks. It is not thought that she could work more than two or three hours out of
> the day at this time.
>
> It is also felt that she does need some resting hand splints to help prevent the ulbar
> deformity and hold her wrists in a more functional position during these flares at
> perhaps [sic] at night. Doctor agrees with the workup [sic] by Dr. Jagadessan
> [sic], including the MRI of her back, hip, and knees to delineate other problems
> which do occur with rheumatoid arthritis.

(Def. Ex. C. at 0114). An April 5, 2001, entry shows another review of the plaintiff's situation
by Russell Superfine, M.D., an internist. It further shows that Kemper determined that the
information failed to support a conclusion that she was disabled. (*Id*. at 0115). Dr. Superfine
stated that "although the claimant would be capable of performing some occupation as a
BellSouth representative, she would be restricted from utilizing her hands for fine motor
movements at the present time. It is recommended that further evaluations be preformed at least
monthly to evaluate the inflammation of her hands." (*Id*.). The plaintiff and BellSouth were
informed of the status of the claim on April 24, 2001. (*Id*. at 0116-17).

4

The plaintiff filed her first level appeal. (*Id.* at 0121). A May 8, 2001, computer entry

states that the plaintiff's first appeal was denied. Specifically, the reviewer, Alan Gruskin, D.O.,

a physiatry expert, states as follows:

> The claimant is a 44-year-old right hand dominant woman with a history of
> rheumatoid arthritis with an apparent exacerbation. She was last seen by her
> primary doctor on 3/20/01 and released to return to work within specific
> restrictions. She has continued on medications of Celebrex and Plaquenil and has
> also seen a neurologist Dr. Jagadessan [sic] who has released the patient to return
> to work as of 2/29/01. There are no records past these dates except for the
> independent medical evaluation which as noted, is dated 3/23/01. The overview
> from Dr. Henderson notes that the patient has a flare of her rheumatoid arthritis
> with synovitis in the upper extremities which would potentially interfere with
> some activities of her work. However, he noted that she may be able to do some
> work for short periods of time using a mouse at a computer, she will require wrist
> supports and hand support and frequent breaks.
>
> As noted there are no further records from April or May of this year. Therefore
> current or updated objective deficits are not documented. The available records
> have documented that the patient is able to return to sedentary to light duty work
> within the specific restrictions of avoiding repetitive activities to the upper
> extremities and obtaining the appropriate adaptive devices. There are no records
> suggesting that the patient could not perform from a physical standpoint within
> these restrictions. An additional record noted at this time includes a functional
> capacity evaluation which has been performed on 2/14/ and 2/15/01 which has
> documented that the patient could work for full time at that time in a sedentary to
> light capacity within the limits defined by the FCA. Subsequently, the medical
> records do not support disability as noted as recently as the end of March, the
> patient has been released to sedentary to light duty activity with specific
> restrictions both by her neurologist and rheumatologist and prior functional
> capacity evaluation did not demonstrate findings that would preclude her from
> working in "any" occupation. There are no records updating her objective
> physical findings and most recent records available have been reviewed.

(*Id.* at 0119-20). The plaintiff was informed of the continued denial of benefits by letter dated

May 11, 2001. It provides:

> On 3/8/01, you filed a request for a first level review of Short Term Disability
> Benefits denied effective 2/9/01.

We have completed a thorough re-examination of the medical evidence in your file. Included in this review, was all medical information received from your physicians, Dr. Holden, Dr. Pugliese, Jerry Atkins, who administered the FCE, Dr. Jagadesen [sic], Riverview Regional Medical Center, and Dr. Henderson, an IME provider.

On 2/8/01, 3 attempts were made to Dr. Holden's office to confirm we had the correct fax number in order to fax medical forms for the doctor to complete. We were unsuccessful due to constant busy signals. The forms were finally faxed in the late afternoon. We also requested the objective medical informatbility [sic] benefits were denied effective 2/9/01.

On 2/21/01, your case manger [sic] received additional medical information from Dr. Holden dated 1/11/01. It is documented that you have had Rheumatoid Arthritis since 1984. Treatment included Methotrexate without success. Your weight was 234 pounds and you are 5 feet 5 inches tall. The doctor documented there is some swelling of the second and third MCP, and PIP. Both wrists have Synovitis, shoulder Capsulitis bilaterally, dorsal Kyphosis, knee joint space tenderness without redness, effusion, or warmth.

It is noted there is 1+ Crepitus in your ankles, gait was antalgic. The doctor recommended a Neurological consult and you were advised to follow-up in 3 months. Noted on 2/20/01, an IM injection was given and the doctor provided a projected return to work date of 3/9/001 [sic]. It is noted a Functional Capacity Evaluation was pending. It is also noted there is pain and swelling in your hands.

On 3/2/01, your case manager contacted Dr. Holden. She requested the recent office notes and questioned if a Functional Capacity Evaluation was performed, and if so, she requested a copy of the results. The office requested something in writing, and your case manager faxed a written request for this information. Also on 3/2/01, your employer contacted your case manager and requested we schedule an IME. The IME was scheduled for 3/14/01 with Dr. Shindalore.

On 3/9/01, your case manager received a copy of the Functional Capacity Evaluation dated 2/14/01 and 2/15/01 which indicted [sic] you were capable of working with restrictions. Your IME was rescheduled for 3/23/01 with Dr. Henderson.

On 4/2/01, your case manager received the IME report which indicated you were capable of working with restrictions.

On 4/5/01, your case manager reviewed the IME and FCE with our KNS physician. It was determined that the medical information failed to support

6

disability. It was determined that the medical information indicates there is a degree of Synovitis which would preclude you from using your hands at the present time, however, per your plan, you would be capable of performing some occupation at BellSouth.

Received with your appeal request, is a physician report form indicating you were last seen by the doctor on 3/20/01 and released to return to work, a progress note dated 1/11/01, and a physician report form with no date indicating you can return to work on 2/29/01.

On 5/8/01, I reviewed your entire case with our KNS physician. It is documented that you were last seen by your pri supports as well as frequent breaks. Therefore, the current available records document that you are able to return to work in a sedentary light duty position with the restrictions of avoiding repetative [sic] activities to the upper extremities and obtaining the appropriate adaptive devices. It is also noted that the prior Functional Capacity Evaluation did not demonstrate findings that would preclude you from working in any occupation.

Your physicians have not given us sufficient objective medical data to support your being "disabled" from any type of work. These terms are defined in Section 2 of the BellSouth Short Term Disability Plan, as follows: "Disability" means a medical condition which makes a Participant unable to perform any type of work as a result of a physical or mental illness or an accidental injury. 'Any type of work' includes the Participant's regular job with or without accommodations, any other Participating Company job (regardless of availability) with or without accommodations, or temporary modified duties. 'A Participating Company job' is any job within a Participating Company; or any job outside a Participating Company, which is comparable in skills and functions. A Participant subject to a Disability is referred to as being "Disabled".

Therefore, your short-term disability benefits remain denied effective 2/9/01.

(*Id*. at 0121-23).

The plaintiff's counsel sought a second review of the denial of benefits. (*Id*. at 0125).

On July 26, 2001, Dr. Holden sent a letter to Kemper, stating, in part, that the plaintiff was seen

on June 9, 2001. His evaluation was as follows:

[Patient] continues to do poorly with pain involving her low back left leg wrists hands knees [and] ankles. [She] has difficulty sitting more than ½ hour w/o changing positions. Despite meds has pain with repeatative [sic] motion.

7

Insomnia. Diffuse tenderness over L Paralumbar region swelling of the MCP wrists ankles. Not responding well to meds. No[t] capable of carrying on productive work.

(*Id.* at 0126; Vega Dep. at 46). The Kemper representative noted, "Recognize medical data does not support a disability[.] Forwarded to appeals." (*Id.*).

Kemper denied the plaintiff's second level appeal on September 10, 2001. (*Id.* at 0126-27). In a letter to the plaintiff's counsel, Kemper stated, in pertinent part:

On 7/13/01, you filed a request for a second level appeal of our original decision and denial effective 2/9/01.

The Appeal Review Committee has conducted an extensive re-examination of the medical evidence in your client's file. In conducting it's review, the medical evidence received from your client's physicians, Dr. Holden, Dr. Pugliese, The Rehab Center, Gadsden Regional Medical Center, Dr. Henderson, Dr. Jagadeesan, and our KNS physicians was re-examined. This review included all medical information submitted with your 2nd level appeal request. Since our original decision was rendered, you have failed to submit any new evidence that would support a change in our previous decision.

The medical information provided does not support your being "disabled" from any type of work. These terms are defined in Section 2 of the BellSouth Short Term Disability Plan, as follows: "Disability" means a medical condition, which (i) makes a Participant unable to perform any type of work as a result of a physical or mental illness or an accidental injury or (ii) results in a Participant receiving treatment that qualifies as a Chemical Dependency Confinement. "Any type of work" includesr [sic] such confinement for which an appeal is depending and has not been ultimately determined in accordance with the claims and appeals provisions of the Plan) and which is approved by or covered under the applicable BellSouth or Affiliate sponsored group health plan covering the Participant (or would be approved by or covered under such applicable group health plan if the Participant had not waived such coverage). A participant subject to a Disability is referred to as being "Disabled." Based on this review, our decision to deny benefits effective 2/9/01 is upheld. According to Section 6.6 of the BellSouth Short Term Disability Plan, Final Authority: The Appeal Committee has complete discretionary authority to determine Benefits and to interpret the terms and provisions of the Plan. Such determinations and interpretations shall be final and conclusive.

8

(*Id.* at 0127-28).  As usual, BellSouth was informed of the continued denial of benefits.  (Vega Dep. at 48-49).

The plaintiff is presently receiving Social Security benefits premised upon her physical condition which is at issue in this litigation.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324.  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255.  Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## DISCUSSION

If an ERISA benefits plan gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits and to construe the terms of the plan, a court reviewing a denial of benefits challenged under section 502(a)(1)(B) of ERISA should apply an abuse of discretion standard, which is also known as the arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989). If, however, there is a conflict of interest between the deciding body and the best interests of the plan participants, then a reviewing court is to apply a heightened arbitrary and capricious standard of review. *HCA Health Services v. Employers Health Ins. Co.*, 240 F.3d 982, 993 (11th Cir. 2001).

The defendants assert that the court should apply the arbitrary and capricious standard of review. (Doc. 14 at 4). The plaintiff counters that the heightened arbitrary and capricious standard is applicable. (Doc. 16 at 6). The plaintiff premises her contention on the conclusion that Kemper was BellSouth's agent. (*Id.*). She also asserts that the defendants operated under a conflict of interest warranting application of the heightened standard.[6] (*Id.*). Finally, the defendants assert that the plaintiff's claims against the other benefit plans are premature. (*Id.* at 9).[7]

*HCA Health Services* sets out the procedure to be applied in the present situation. "First, a court looks to the plan documents to determine whether the plan documents grant the claims

---

[6] Defendant BellSouth Telecommunications initially asserted that it is not a proper party to this action. (Doc. 14 at 3). Counsel abandoned that contention at the oral argument.

[7] In view of the court's determination that summary judgment is not due to be granted on the STD Plan claim, it is not necessary to address this contention at this juncture.

10

administrator discretion to interpret disputed terms. If the court finds that the documents grant

the claims administrator discretion, then at a minimum, the court applies arbitrary and capricious

review and possibly heightened arbitrary and capricious review." *HCA Health Services*, 240

F.3d at 993. Second, "the court evaluates the claims administrator's interpretation of the plan to

determine whether it is 'wrong.'" *Id.* Third, if the court finds that the decision is wrong and the

arbitrary and capricious standard is applicable, then the court must determine if the "wrong

decision is nonetheless reasonable." *Id.* If the claims administrator is acting under a conflict of

interest, then the "interpretation is not necessarily entitled to deference." *Id.* Accordingly, the

court must next determine the self interest of the claims administrator. *Id.* If the court finds a

conflict of interest, then the claims administrator must show "that its interpretation of the plan is

not tainted by self-interest." *Id.* This burden is satisfied if it is shown "that its wrong but

reasonable interpretation of the plan benefits the class of participants and beneficiaries." *Id.* at

995.

### Plaintiff's Agent Arguments

The plaintiff initially argues that Kemper is merely BellSouth's agent. She cites to the

Supreme Court's decision in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 112 S. Ct. 1344,

117 L. Ed. 2d 581 (1992), in support of her argument that common law agency principles apply

in resolving this issue. In *Darden*, the Supreme Court adopted a common-law test for

determining who qualifies as an "employee" under ERISA. The Court stated that "[i]n the past,

when Congress has used the term 'employee' without defining it, we have concluded that

Congress intended to describe the conventional master-servant relationship as understood by the

common-law agency doctrine." *Darden*, 503 U.S. at 323, 112 S. Ct. at 1348. Citing *Community*

11

*for Creative Non-Violence v. Reid*, 490 U.S. 730, 109 S. Ct. 2166, 104 L. Ed. 2d 811 (1989), the

Court further stated:

> "In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party." 490 U.S. at 751-52, 109 S. Ct. at 2178-79 (footnotes omitted).

*Darden*, 503 U.S. at 323, 112 S. Ct. at 1348. The Court also stated in a footnote, "As in *Reid*, we

construe the term to incorporate 'the general common law of agency, rather than . . . the law of

any particular State.'" *Darden*, 503 U.S. at 323 n.3, 112 S. Ct. at 1348 (citing *Reid*, 490 U.S. at

740, 109 S. Ct. at 2173).

The plaintiff argues that "[a] reasonable fact finder could determine that Kemper is the

agent of BellSouth from provisions in the contract between Kemper and BellSouth, from the

testimony of Kemper's employees, from documents in the claim processing files of Kemper

relating to this and other cases and from the testimony of BellSouth's employees." (Doc. 16 at

7). The plaintiff initially premises this argument on the fact that the agreement between Kemper

and BellSouth requires Kemper to act in accordance with written claims procedures provided by

BellSouth. The agreement states:

> Kemper shall act within the authority granted to it, reasonably interpreted; if it shall exceed or violate its instructions, it does so at its own risk, BST having the privilege of affirming or dissenting, as its interest may dictate.
>
> All instructions or changes to instructions are required to be in writing from BST

12

to Kemper.  Such instructions must be dated by BST and must be confirmed in writing by Kemper within five (5) days after receipt from BST.

Where specific instructions as to a particular matter have been given, Kemper is charged with strict compliance with such instructions, no matter how broad its general powers may otherwise have been.

. . . .

(Ex. 2 at 00185).  The plaintiff further argues that the same standards that were used by BellSouth before Kemper became the claim administrator are still applicable.  More specifically, the plaintiff states that BellSouth "prepared the STD Plan Special Section giving Kemper instructions as to how to interpret and implement the plan," which requires "Kemper to use the same objective evidence of functional impairment criteria that BellSouth used from 1990 through 1996."  (Doc. 16 at 9).  In support of this argument, the plaintiff states that the language used by Kemper to deny the plaintiff's claim is identical to the language previously used by BellSouth employees prior to 1996.  (*Id.*).  Additionally, she states that BellSouth in fact has exercised its retained rights in administering numerous claims.  By way of example, she states that when BellSouth has instructed Kemper to have an independent medical examination done, it does so.[8] (*Id.*).

The record demonstrates that this issue has been addressed by at least two judges in this District.  Judge William M. Acker, Jr., addressed the issue in *Carl Wright v. BellSouth Telecommunications, Inc.*, CV 01-AR-2213-S (N.D. Ala. October 10, 2001).  Therein, he held as follows:

Wright argues persuasively that Kemper is not a true third party administrator because BellSouth controls the method and manner by which

---

[8] The plaintiff notes that this was required in her case and in the case of another claimant, Sherri Ashley.  (*Id.* at 9-10).

Kemper processes claims just as BellSouth did when its own employees decided claims. Kemper's employees use the procedures and interpretations mandated by BellSouth just as BellSouth's own employees did. "If a company is acting as a plan administrator, then it should be held liable for such conduct regardless of a sham designation in the plan document." *Rosen v. TRW, Inc.*, 979 F.2d 191 (11th Cir. 1992). Furthermore, in order to avoid a conflict of interest the plan must be structured with a real trust from which the beneficiaries are paid and not paid at all if the trusts [sic] does not have assets. *Vann v. National Rural Elect. Coop. Assoc. Retirement and Security Program*, 978 F. Supp. 1025 (M.D. Ala. 1997).

(*Id.* at 11). Judge Sharon L. Blackburn specifically rejected the arguments proffered by the plaintiff in this action in *Marcia Williams v. BellSouth Telecommunications, Inc.*, No. CV 01-B-2358-S (N.D. Ala. March 17, 2003). She stated:

First, based upon a review of the record, the court is of the opinion that Kemper is not the "agent" of BellSouth.[9] Some of the factors used to determine whether an agency relationship exists include, the extent to which the principal controls the manner and means by which the alleged agent conducts its work, the discretion afforded the alleged agent, and the alleged agent's role in hiring and paying its workers. *See Darden*, 503 U.S. at 323-24 (quoting *Reid*, 490 U.S at 751-52).[ ]

Under the SPD, Kemper has been delegated complete authority and discretion to make claim determinations. Kemper pays and supervises its own employees who make such decisions, and the physicians who assist them are not BellSouth employees.[ ] Kemper's Benefit Review Committee, which reviews the decisions of Kemper's Case Managers on appeal, and makes a final determination, is comprised of employees of Kemper, not BellSouth.[ ] While plaintiff argues that certain documents were provided by BellSouth to Kemper to assist it in administering claims, BellSouth has had other communications with Kemper, such conduct and interaction is incidental to the contract relationship between the parties and does not establish agency. In short, a certain amount of

---

[9] Addressing Judge Acker's decision, Judge Blackburn stated:

Subsequent to oral argument, plaintiff's counsel provided the court with an opinion entered by Judge Acker in *Carl Wright v. BellSouth Telecommunications, Inc.*, No. 01-AR-2213-S (N.D. Ala. October 10, 2002). Counsel correctly notes that Judge Acker found sufficient evidence to conclude that Kemper is BellSouth's agent. The court has read Judge Acker's opinion but is not persuaded that its decision that Kemper is not BellSouth's agent is wrong. In addition, although counsel represents that the evidence of agency before this court and before Judge Acker is the same, the court notes that it would be speculating if it made such a conclusion based on the record before it.

*Williams*, No. CV 01-B-2358-S at p. 9 n.8.

contact between the plan administrator, BellSouth, and the claims administrator, Kemper, is necessary and appropriate in administering BellSouth's benefit plans. Accordingly, based on these facts, the court is of the opinion that Kemper is not an agent of BellSouth,[10] and will therefore apply the arbitrary and capricious standard.

*Williams*, CV 01-B-2358-S at 10 (certain footnotes and citations omitted). The plaintiff argues that Judge Blackburn's decision in *Williams* does not adequately address the contract language or "the clear evidence that BellSouth issues instructions to Kemper."[11]  (Doc. 16 at 11).

The first issue in this case is whether Kemper can be considered an "agent" of BellSouth. The court begins its analysis by examining the plan documents.[12]  The Summary Plan Description ("SPD") states that "Kemper is the named fiduciary under the plan with complete authority to review all denied claims for benefits in exercising such fiduciary responsibility." (Pl. Ex. 11 at 3108). It further states that "Kemper shall have discretionary authority to determine whether or to what extent participants are eligible for benefits and to construe disputed or doubtful plan terms." (*Id.*). This language tends to indicate that Kemper is not the agent of BellSouth for purposes of determining the standard of review. However, the plaintiff asserts that the language in the March 1, 2000, agreement between BellSouth and Kemper, which states "Where specific instructions as to a particular matter have been given, Kemper is charged with strict compliance

---

[10] Judge Blackburn also noted, "The court also finds that Kemper is not operating under a conflict of interest. As noted above, Kemper has full discretion to make decisions regarding benefits, and the decision to grant or deny benefits has no effect on its financial assets." (*Williams*, p. 11 at n.11).

[11] The parties also note that Chief Judge U.W. Clemon of this court has been presented with the same issue. Although the plaintiff states that the defendants rely on the decision in *Muskett v. BellSouth Tele., Inc.*, No. CV 99-C-2716-S (N.D. Ala. March 2002), for the proposition that the arbitrary and capricious standard is applicable, a review of the defendants' brief reveals that the *Muskett* case was not cited by the defendants. In *Henderson v. BellSouth Tele., Inc.*, No. CV 00-C-2373-S (N.D. Ala. September 30, 2002), Judge Clemon summarily denied the defendants' motion for summary judgment. (Pl. Ex. 16).

[12] Although the record does not include all the Plan documents, the court afforded the parties an adequate opportunity to submit the same prior to oral argument. It declines at this juncture to permit the parties to supplement the record on the motion for summary judgment.

with such instructions, no matter how broad its general powers may otherwise have been" and the language in the Appendix, which provides that "Kemper shall adjudicate all Plan claims and appeals in accordance with written claim review procedures provided by BST," changes the standard of review in this case. (Doc. 16 at 8 (citing Pl. Ex. 2 at 00185 & 00206)).

Placing the foregoing language in the context of the present proceeding, its meaning is unclear, at least for purposes of summary judgment. The language easily could be interpreted to mean that BellSouth has the right and authority to provide binding substantive instructions to Kemper regarding what evidence of a disability is required before a claim is to be paid. That is in essence what the plaintiff is asserting in this case. She states that BellSouth is requiring Kemper to have objective evidence of a disability before eligibility is found. In support of this contention, the plaintiff states that the testimony of Helen Peavler, a BellSouth Benefits Director, in the case of *Jennifer Brewer v. BellSouth Telecommunications, Inc.*, CV 00-AR-2478-S (N.D. Ala. December 18, 2001), demonstrates that Kemper uses the same guidelines that BellSouth used before Kemper took over administration. Peavler testified as follows:

> . . . .
>
> And then in order to qualify, the employee would need to provide satisfactory evidence of a disabling condition that prevented the employee from doing any type of work. And any type of work is defined as the employee's own job with or without accommodations, any other job with or without accommodations, and any temporary modified duty.
>
> Q.  Where does the term "satisfactory evidence of medical disability" come from?
>
> A.  It's actually stated in the summary plan description.
>
> Q.  Okay.

16

What kind of medical information must an employee provide that would constitute satisfactory medical information?

A.      The employee would need to provide objective evidence of a disabling condition.  All of the evidence that an employee provided would be reviewed, both objective and subjective.  But the employee would need to provide evidence of functional impairment that was sufficient to prevent the employee from being able to perform any type of work.

Q.      What is meant by functional impairment?

A.      Well, function deals with your ability to act, to move, to do work.  And an impairment means that you have some limitation with regard to your normal functional capabilities, and that functional impairment would need to be sufficient to say that the person was unable to do any job with or without accommodations.

Q.      Now, you've used the term "objective medical evidence," I believe.  Did I understand that correctly?

A.      Yes, sir.

Q.      Is that term or is that phrase found within the short-term disability plan?

A.      No, sir, the term "objective" is not.

Q.      Well, who is it that decided, if you know, that employees are to be required to present objective medical evidence in order to qualify under the plan?

A.      It was the EBCRC, the Employee Benefit Claim Review Committee.

Q.      Are employees - - Or are their medical providers somehow advised that the company looks for objective medical evidence to substantiate a claim for disability or for short-term disability?

A.      Generally they would be advised in the course of the management of the case so that in conversation with the employee's provider or in direct conversation with the employee the case manager might indicate that objective medical information is needed.  And the case manager would probably, might very well define objective medical information and indicate that objective medical information would be things like test results.  It might be X-ray results, MRI results, blood tests.  It might be nerve conduction studies.  It would be measurable, quantifiable information that would support the impairment and would explain why the employee was disabled from all work.

17

(Pl. Ex. 6 at 40-42). Her testimony in that trial also indicated that as a result of concerns voiced by the employees' union, the senior vice president of BellSouth Human Resources issued a letter and included a document that "described how both objective and subjective information is used in determining disability."[13] (*Id*. at 54). Peavler's testimony demonstrates that objective criteria was first required when BellSouth administered the Plan before Kemper. This is further demonstrated by the fact that the language used by Kemper in denying the plaintiff benefits in this case is the same as the language previously used by BellSouth.

In support of her argument that Kemper is merely BellSouth's agent, the plaintiff also states, "When BellSouth instructs Kemper to have an Independent Medical Examination (IME) performed Kemper immediately does so. Kemper has never refused to perform an IME when BellSouth instructed Kemper to perform one." (Doc. 16 at 9). In support of these conclusory statements, the plaintiff cites to Kemper's records in the *Henderson* and *Williams* cases. The Kemper records concerning Henderson contain the following entry, "O Requested an IME due to termination. Will contact with IME appt info."[14] (Pl. Ex. 5 at 0170). The Kemper records concerning Williams contain the following entry, "The supervisor has called. Her benes [have] been denied. We need to get an IME prior to removing her from the payroll." (Pl. Ex. 15 at 0048).[15] The testimony of Vega confirms that these records demonstrate that the employer, BellSouth, had requested the IME and the case manager requisitioned the same. (Vega Dep. at 37-38). In the present case, the plaintiff asserts that the situation is the same – BellSouth

---

[13] Neither a copy of the letter nor the attached document are included in the record.

[14] The court reasonably assumes that "O" stands for observation. Counsel were unable to clarify what "O" meant at the oral argument.

[15] The record on that page actually includes two entries on different dates with the same information.

requested the IME and Kemper ordered the test.  (Doc. 16 at 9).  The record demonstrates that on

March 2, 2001, the case manager discussed the plaintiff's situation with BellSouth

representatives.  The case manager's written observation states that they (BellSouth) advised that

the "employee is being terminated, questioned status of IME, as requested on 2/22.  Advised

currently will attempt to obtain FCE results from treating provider as well as F/U on scheduling

IME, advised scheduling could take as long as 2-3 weeks to find IME provider."  (Def. Ex. C at

0109).

     The plaintiff also cites the facts in *Sherri Ashley v. BellSouth Telecommunications, Inc.*,

CV 00-C-3590-S (N.D. Ala. December 19, 2000), in support of her contentions.  Ashley was

suffering from depression and sought disability benefits.  Her claims were denied by Kemper.

On December 19, 2000, Chief Judge U.W. Clemon issued a preliminary injunction preventing

BellSouth from terminating Ashley pending a ruling in her case.  BellSouth contacted Kemper,

"stating that patient [(Ashley)] needs to be reinstated . . . because she has a court injunction to do

so."  (Pl. Ex. 8 at 0074).  On January 3, 2001, BellSouth informed the reviewer that the

injunction did not affect the appeals process which should continue.  (*Id.*).  According to the

plaintiff, BellSouth instructed Kemper to award the plaintiff benefits on or about May 22, 2001,

and Kemper complied.[16]  The court does not find the *Ashley* evidence instructive on this issue.

     Because the evidence at this juncture must be construed in a light most favorable to the

plaintiff, the court cannot conclude that BellSouth does not control the method and manner by

which Kemper processes and determines claims.  Arguably, the evidence shows that Kemper

---

[16] Although the defendants do not dispute this, the record does not contain any documentation regarding this assertion.
The court also notes that the docket sheet in the *Ashley* case states that it was settled by the parties.  (June 28, 2002, docket entry
(# 37)).

19

processes disability claims in the same manner that BellSouth did previously. Additionally, as already noted, the evidence demonstrates that BellSouth has explicitly limited Kemper's actions when specific instructions are given. The limiting language is very definitive in that it states that "Kemper is charged with strict compliance with such instructions, no matter how broad its general powers may otherwise have been." Without further evidence and explanation, this evidence precludes a determination as a matter of law that Kemper is not acting as the agent of BellSouth for purposes of applying the arbitrary and capricious standard of review.[17] Accordingly, the heightened arbitrary and capricious standard is due to be applied at this juncture.[18]

## Was the Decision Wrong?

The next question is whether the decision is wrong. *HCA*, 240 F.3d at 994. The defendants argue that there is no evidence that they erroneously denied the plaintiff's claim. (Doc. 18 at 4). The plaintiff argues that the determination is erroneous because it fails to consider all the evidence and instead is premised on only "objective evidence." (Doc. 16 at 15). She further argues that this is incorrect because the defendants applied the wrong criteria and the court should not use the interpretation that was used by the defendants. Instead, she asserts that the court should consider all of the available evidence regardless of whether it is "subjective, objective, or opinion to determine whether or not the [plaintiff] can perform [her] job with or without accommodations and any other company job with or without accommodations." (*Id.*).

The court agrees with the plaintiff's contention that the court is to consider all of the

---

[17] Although further explanation was offered by counsel at the oral argument, the supporting evidence was not before the court.

[18] This does not preclude reconsideration of the appropriate standard at a hearing on the merits.

relevant evidence regarding her condition. In *Godfrey v. BellSouth*, 89 F.3d 755, 757 (11th Cir. 1996), the plaintiff sought disability benefits premised on her fibromyalgia; a thirty degree angle of pressure on the spine; lumbar disc syndrome; rotator cuff disease; severe sciatic pain and sacral pain; chronic dorsal lumbar strain; and joint swelling pain.  Chief Judge Clemon found that the evidence conclusively proved that her pain was severe and disabling.  *Godfrey*, 89 F.3d at 757.  BellSouth asserted that Godfrey was not entitled to benefits because she did not furnish satisfactory evidence of her disability.  The Plan at issue did not specifically define disability, but paid benefits when a participant was "temporarily disabled from work by reason of sickness." *Id.* at 758.  BellSouth argued that Godfrey was required to show that she had a loss of function which would prevent her from doing her job duties.  One of BellSouth's medical consultants stated, that "pain alone does not substantiate disability." *Id.* Rejecting BellSouth's position, the Eleventh Circuit Court of Appeals stated, "The plan is designed to pay benefits when a participant is 'disabled from work by reason of sickness.'  Nothing in the plan requires BST's narrow interpretation of the language.  'Disabled from work' can mean more than physical paralysis or limited limb movement." *Id.* Similarly, this court finds that nothing in the present Plan requires that only "objective evidence" can support a determination that the plaintiff is disabled.  Relevant subjective observations cannot be ignored and excluded from consideration.  Accordingly, the court will review all the evidence to determine whether the decision is wrong.

In support of her argument that the decision is wrong, the plaintiff relies principally upon three items.  Those items are (1) the determination of the Social Security Administration in her case, finding that she is disabled; (2) the evidence of her treating physicians, particularly Dr. Holden; and, (3) the IME done by Dr. Henderson.

21

First, with regard to the Social Security decision, the court finds that although it should not be ignored, the decision is not particularly helpful for various reasons. The decision was rendered on December 4, 2002, and therefore unavailable at the time of the determination in this case to deny the plaintiff benefits. *See Jett v. Blue Cross and Blue Shield*, 890 F.2d 1137, 1139 (1989) (the court is to review "the facts as known to the administrator at the time the decision was made"). Additionally, the standards and considerations in each determination are not the same.

Second, with regard to the documents from Dr. Holden, including the "Physician Report" (Def. Ex. C at 0053), his September 2001 letter (*id*. at 0043), and his letter concerning her June 9, 2001, visit (*id*. 0174), a detailed review is appropriate. The "Physician Report" clearly states that the plaintiff was unable to work. (*Id*. at 0053). His letter concerning the June 9, 2001, visit also states that she was "not capable [of] carrying on productive work." (*Id*. at 0174). His September 2001, letter states in the "Assessment" section as follows:

> Rheumatoid arthritis with objective evidence. Methotrexate pneumonitis. Low back pain likely on bases of degenerative arthritis. A Functional capacity was done February 17th, 2001 which recommended the following modifications[:] reduced lifting, repetitive squats. Limitation of elevated work forward bending. Unfortunately, instead of working with her at work she had her work terminated.[19]

(*Id*. at 0043). Contrary to the foregoing, Dr. Holden's "Attending Physician Statement" of March 20, 2001, lists the plaintiff's work status as "Released with Temporary Accommodations/ Restrictions." (*Id*. at 0067). Dr. Thomas Pugliese's "Attending Physician Statement" dated February 29, 2001, also states that the plaintiff's work status was "Released Full Duty." (*Id*. at

---

[19] This last sentence could be construed to mean that Dr. Holden believed that she was able to work. However, to reach such a conclusion, the court would have to construe the evidence in a light most favorable to the defendants, something it cannot do on a motion for summary judgment.

0065). The Functional Capacity Evaluation done on February 14-15, 2001, concludes with the

following recommendations:

> 1. These work projections are for 8 hours per day, 40 hours per week at the levels indicated on the FCE form.
> 2. Consider work conditioning program with incorporation of aquatic therapy.
> 3. Return to work in the **SEDENTARY TO LIGHT CAPACITY** within the limits definced [sic] in this FCE.

(*Id.* at 72) (emphasis in the original).

Third, with regard to the IME done by Dr. Henderson, the plaintiff asserts that it shows

that she was unable to work. (Doc. 16 at 17). The defendants counter that the plaintiff has not

adequately stated Dr. Henderson's position. (Doc. 18 at 5). Dr. Henderson's "Overview" of the

IME states:

> Patient's flare of her rheumatoid arthritis and degree of synovitis along with her deformities are in the moderately severe category; she is at this point unable to work even a part time job which requires the use of her hands. She may be able to do some work for short periods of time using a mouse at a computer, although she still would need some wrist support and hands [sic] support and need frequent rest breaks. It is not thought that she could work more than two or three hours out of the day at this time.

(Def. Ex. C at 0165).

In resolving this issue, the court must return to where it began, with the definition of a

"disability" under the Plan:

> "Disability" means a medical condition which makes a Participant unable to perform any type of work as a result of a physical or mental illness or an accidental injury. "Any type of work" includes the Participant's regular job with or without accommodations, any other Participating Company job (regardless of availability) with or without accommodations, or temporary modified duties. "A Participating Company job" is any job within a Participating Company; or any job outside a Participating Company which is comparable in skills and functions. A Participant subject to a Disability is referred to as being "Disabled."

23

(Pl. Ex. 11 at 3123).  Reviewing all of the evidence in the record with regard to this definition, and in a light most favorable to the plaintiff, the court finds the plaintiff has presented sufficient evidence in response to the defendants' motion for summary judgment to show that the decision to deny her benefits was wrong, at least in part.  The record, when viewed most favorable to the plaintiff, demonstrates that she appears to have been "disabled" for limited periods between the various evaluations and determinations.  The court cannot conclude on the record before it that there was no time that the plaintiff was not disabled.  Thus, the court concludes for purposes of summary judgment that the decision to deny her any benefits arguably was wrong.

### Plaintiff's Conflict Arguments

The plaintiff next argues that the heightened arbitrary and capricious standard is applicable because the administrator has a conflict of interest because the funds paid to the beneficiaries are not paid from a "real trust."  (Doc. 16 at 12).  The defendants respond that Kemper has no conflict of interest because it "does not spend any of its money when it approves a claim for short term disability."  (Doc. 18 at 4).

The evidence before the court includes the SPD for the STD Plan which states:

> The entire cost of the plan is paid by each participating company.  Short-term disability benefits are paid directly by each participating company or from a trust established by the company to fund a voluntary employee's beneficiary association under which such benefit is payable.

(Pl. Ex. 11 at 3108).  The deposition testimony of Peavler provides that when Kemper approves a claim, a notice[20] is sent to the respective BellSouth payroll office that generates the payment to the employee.  (Pl. Ex. 1 at 105-07).  Peavler further states that the money for disability payments

---

[20] Counsel for the defendant indicated at oral argument that this is now an electronic transmission from Kemper to the appropriate payroll section at BellSouth.

is segregated from the usual funds in a trust.[21]  (*Id*. at 108).  According to Donna Ann Davis in the *Ashley* case, however, the disability payments to employees are not contingent upon there being sufficient funds in the trust.  (Pl. Ex. 3 at 33, 36-37).

Presuming for purposes of summary judgment that Kemper is the agent of BellSouth for the reasons expressed previously, the next question is whether the trust in this case is the type of trust anticipated by ERISA.  In view of the foregoing evidence, the court is unwilling to conclude at this juncture that there is no conflict in this case.  If BellSouth is paying benefits from payroll funds and not from "trust" funds, then conflict issues do arise.  *See Vann v. National Rural Elec. Co-op. Association Retirement and Sec. Program*, 978 F. Supp. 1025, 1035 (M.D. Ala. 1997) ("It is also clear from Eleventh Circuit precedent recognizing the inherent conflict of an insurance company administering a benefits plan or an employer administering a plan from its operating assets, that an inherent conflict of interest is recognized when the administrator incurs a direct, immediate expense from benefits determinations.").

Premised on the foregoing, the defendants must now show that the interpretation of the claims administrator is not tainted by self-interest.  *HCA Health Services*, 240 F.3d at 994-95. Since the court has found that Kemper is BellSouth's agent under the present facts, the court must be satisfied that neither Kemper's nor BellSouth's actions are tainted by self-interest.  The court cannot so find under the circumstances at this juncture.

The decision to deny the plaintiff even partial benefits under the circumstances by requiring objective evidence of a functional impairment advances the interests of BellSouth over

---

[21] Peavler believes the situation is the same with regard to the LTD Plan.  (Pl. Ex. 1 at 115).  The remainder of the record, however, makes it clear that although there is a trust fund, the payments are made out of the respective BellSouth payroll account regardless of the status of the "trust."

those of the Plan participants or beneficiaries.  Requiring such a narrow construction of the STD

Plan by Kemper advances the interests of BellSouth in that it reduces the payment of benefits to

Plan participants, like the plaintiff, that might otherwise qualify for payments which would be

paid out of the operating assets of BellSouth.  Nothing demonstrates that the defendants' narrow

interpretation of the Plan in any way advances the interests of the Plan participants.

### CONCLUSION

In view of the foregoing, the defendants' motion for judgment on the pleadings (doc. 13)

is due to be denied.  An appropriate order will be entered.

**DONE**, this the _20th_ day of December, 2003.

**JOHN E. OTT**
United States Magistrate Judge