FILED
2004 JUL 30 PM 3:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| SARITA WASHINGTON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 02-JEO-0645-S |
| ) | |
| BELLSOUTH TELECOMMUNICATIONS, ) | |
| INC., et al., ) | **ENTERED** |
| ) | |
| Defendants. ) | **JUL 30 2004** |

## MEMORANDUM OPINION

This matter is before the court following a trial on the merits. Premised on the evidence and arguments of counsel, the court finds that judgment is due to be entered on behalf of the defendants.

The plaintiff, Sarita Washington (hereinafter "the plaintiff"), alleges that the defendants, BellSouth Telecommunications, Inc. (hereinafter "BellSouth"), Kemper National Services, Inc. (hereinafter "Kemper"), the BellSouth Short Term Disability Plan (hereinafter "STD Plan"), the BellSouth Long Term Disability Plan (hereinafter "LTD Plan"), the BellSouth Health Insurance and Dental Insurance Plan, and the BellSouth Pension Plan (hereinafter collectively "the defendants") wrongfully denied her benefits under BellSouth's STD and LTD Plans. (Doc. 1).[1] The court previously denied the defendants' motion for summary judgment. (Doc. 24).

### BACKGROUND FACTS[2]

The plaintiff began working for BellSouth in about 1979. She worked there as a service

---

[1] References herein to "Doc. ___" are to the document numbers assigned the pleadings by the Clerk of the Court.

[2] Much of the background information is derived from the court's opinion denying the defendants' motion for summary judgment. It is repeated verbatim because the facts generally are not in dispute. Instead, it is the conclusions derived from the relevant facts that are in dispute.

representative until her separation. She was a participant in the BellSouth STD and LTD Plans. Kemper was the claims administrator under the policies during the relevant period.

The plaintiff has a history of rheumatoid arthritis dating back to 1984. (BST 0043).[3] On or about February 2, 2001, she stopped reporting to work purportedly due to debilitating pain. She filed a request for STD benefits on February 7, 2001. (Marisol Vega Dep. (hereinafter "Vega Dep." at 14)).[4] The plaintiff's claim was assigned to case manager Dorothy Barnes. (Vega Dep. at 17). Her claim was premised in part on the report of the plaintiff's rheumatologist, Daniel Holden, M.D. (BST 0105).[5] The report states that the plaintiff suffers from rheumatoid arthritis; that her condition was evidenced by synovitis hands and methotrexate pheumonitis; that she was on medication; and, that she would not be able to work. (*Id.*).

Kemper declined to direct the payment of benefits for the plaintiff on February 20, 2001. The denial was effective as of February 9, 2001. (BST at 0106). A computer entry by Barnes provides that the medical information does not support a finding of a disability. (BST 0107). Accordingly, she (Barnes) requested permission from her Kemper supervisor to deny the claim. The supervisor, Ilene Joseph, approved the denial of benefits, stating that "although the labwork [sic] confirms the [diagnosis], I also do not see any specific objective data . . . . I also note no [return to work] yet. Denial approved. Please advise the patient and employer. . . ." (*Id.*). The plaintiff was informed that the medical information did not support a finding of a disability. (*Id.*

---

[3] The medical records are located at document 27, exhibit 1. The "BST ___" numbers are located in the lower right-hand corner of each document. Kemper's records are located at document 27, exhibit 2.

[4] Portions of Vega's deposition is found in the trial record at document 27, exhibit 11. Numerous pages, including page 14, are not included; however, these facts are not disputed.

[5] *See* document 27, exhibit 2.

at 0106-07).

Following the submission of additional medical information from Dr. Holden the next day, benefits again were denied. (*Id.* at 0108). Kemper's notations state that if a functional capacity evaluation (hereinafter "FCE") demonstrates she was unable to work, then she might be eligible for benefits. (*Id.*). The Kemper reviewer parenthetically noted, "I really want to pay her." (*Id.*).

Kemper was informed in a March 2, 2001 telephone conversation that the plaintiff was being terminated. (*Id.* at 0109). During the conversation, representatives of BellSouth inquired concerning the status of an independent medical examination (hereinafter "IME") that had been requested on February 22, 2001. (*Id.*). On the same date, Kemper requested that Dr. Holden forward the FCE results and his progress notes for review. (*Id.*). The results from a February 14-15, 2001 FCE were submitted to Kemper on March 9, 2001. (*Id.* at 0110). The report states that the plaintiff could report to work in a limited capacity. (*Id.* at 0111). The Kemper file notation also states that the "FCE does not support disability . . . Per FCE Patient functional." (*Id.*).

A Rheumatologist IME that had previously been scheduled was canceled on March 9, 2001, so that a Physiatry[6] IME could be performed. (BST at 0111). Kemper scheduled the evaluation with Leigh Henderson, M.D. It was conducted on March 23, 2001. (BST at 0111). The report was received about April 2, 2001, and it confirmed the arthritis diagnosis. (*Id.* at 0113). Kemper's file entry concerning the evaluation provides, in part, as follows:

Overview: Patient's flare of her rheumatoid arthritis and degree of synovitis along

---

[6] Physiatry is a branch of medicine specializing in physical medicine or physical therapy.

3

> with her deformities are in the moderately severe category; she is at this point unable to work even a part time job which requires the use of her hands. She may be able to do some work for short periods of time using a mouse at a computer, although she still would need some wrist support and hands [sic] support and need frequent rest breaks. It is not thought that she could work more than two or three hours out of the day at this time.
>
> It is also felt that she does need some resting hand splints to help prevent the ulbar deformity and hold her wrists in a more functional position during these flares at perhaps [sic] at night. Doctor agrees with the workup [sic] by Dr. Jagadessan [sic], including the MRI of her back, hip, and knees to delineate other problems which do occur with rheumatoid arthritis.

(*Id.* at 0114).

Barnes next requested a review of the plaintiff's condition by Russell Superfine, M.D., an Internist, on or about April 5, 2001. He stated that, "although the claimant would be capable of performing some occupation as a BellSouth representative, she would be restricted from utilizing her hands for fine motor movements at the present time. It is recommended that further evaluations be preformed at least monthly to evaluate the inflammation of her hands." (*Id.* at 0115). Kemper then determined that the information failed to support a conclusion that she was disabled. (*Id.* at 0116). The plaintiff and BellSouth were informed of the status of the claim on April 24, 2001. (*Id.* at 0116-17).

The plaintiff filed her first level appeal. (*Id.* at 0121). A May 8, 2001 computer entry states that the plaintiff's first appeal was denied. Specifically, the reviewer, Alan Gruskin, D.O., a physiatry expert, states as follows:

> The claimant is a 44-year-old right hand dominant woman with a history of rheumatoid arthritis with an apparent exacerbation. She was last seen by her primary doctor on 3/20/01 and released to return to work within specific restrictions. She has continued on medications of Celebrex and Plaquenil and has also seen a neurologist Dr. Jagadessan [sic] who has released the patient to return to work as of 2/29/01. There are no records past these dates except for the

> independent medical evaluation which as noted, is dated 3/23/01. The overview from Dr. Henderson notes that the patient has a flare of her rheumatoid arthritis with synovitis in the upper extremities which would potentially interfere with some activities of her work. However, he noted that she may be able to do some work for short periods of time using a mouse at a computer, she will require wrist supports and hand support and frequent breaks.
>
> As noted there are no further records from April or May of this year. Therefore current or updated objective deficits are not documented. The available records have documented that the patient is able to return to sedentary to light duty work within the specific restrictions of avoiding repetitive activities to the upper extremities and obtaining the appropriate adaptive devices. There are no records suggesting that the patient could not perform from a physical standpoint within these restrictions. An additional record noted at this time includes a functional capacity evaluation which has been performed on 2/14/ and 2/15/01 which has documented that the patient could work for [sic] full time at that time in a sedentary to light capacity within the limits defined by the FCA. Subsequently, the medical records do not support disability as noted as recently as the end of March, the patient has been released to sedentary to light duty activity with specific restrictions both by her neurologist and rheumatologist and prior functional capacity evaluation did not demonstrate findings that would preclude her from working in "any" occupation. There are no records updating her objective physical findings and most recent records available have been reviewed.

(*Id*. at 0119-20). The plaintiff was informed of the continued denial of benefits by letter dated May 11, 2001. It provides:

> On 3/8/01, you filed a request for a first level review of Short Term Disability Benefits denied effective 2/9/01.
>
> We have completed a thorough re-examination of the medical evidence in your file. Included in this review, was all medical information received from your physicians, Dr. Holden, Dr. Pugliese, Jerry Atkins, who administered the FCE, Dr. Jagadesen [sic], Riverview Regional Medical Center, and Dr. Henderson, an IME provider.
>
> On 2/8/01, 3 attempts were made to Dr. Holden's office to confirm we had the correct fax number in order to fax medical forms for the doctor to complete. We were unsuccessful due to constant busy signals. The forms were finally faxed in the late afternoon. We also requested the objective medical informatbility [sic] benefits were denied effective 2/9/01.

5

On 2/21/01, your case manger [sic] received additional medical information from Dr. Holden dated 1/11/01. It is documented that you have had Rheumatoid Arthritis since 1984. Treatment included Methotrexate without success. Your weight was 234 pounds and you are 5 feet 5 inches tall. The doctor documented there is some swelling of the second and third MCP, and PIP. Both wrists have Synovitis, shoulder Capsulitis bilaterally, dorsal Kyphosis, knee joint space tenderness without redness, effusion, or warmth.

It is noted there is 1+ Crepitus in your ankles, gait was antalgic. The doctor recommended a Neurological consult and you were advised to follow-up in 3 months. Noted on 2/20/01, an IM injection was given and the doctor provided a projected return to work date of 3/9/001 [sic]. It is noted a Functional Capacity Evaluation was pending. It is also noted there is pain and swelling in your hands.

On 3/2/01, your case manager contacted Dr. Holden. She requested the recent office notes and questioned if a Functional Capacity Evaluation was performed, and if so, she requested a copy of the results. The office requested something in writing, and your case manager faxed a written request for this information. Also on 3/2/01, your employer contacted your case manager and requested we schedule an IME. The IME was scheduled for 3/14/01 with Dr. Shindalore.

On 3/9/01, your case manager received a copy of the Functional Capacity Evaluation dated 2/14/01 and 2/15/01 which indicted [sic] you were capable of working with restrictions. Your IME was rescheduled for 3/23/01 with Dr. Henderson.

On 4/2/01, your case manager received the IME report which indicated you were capable of working with restrictions.

On 4/5/01, your case manager reviewed the IME and FCE with our KNS physician. It was determined that the medical information failed to support disability. It was determined that the medical information indicates there is a degree of Synovitis which would preclude you from using your hands at the present time, however, per your plan, you would be capable of performing some occupation at BellSouth.

Received with your appeal request, is a physician report form indicating you were last seen by the doctor on 3/20/01 and released to return to work, a progress note dated 1/11/01, and a physician report form with no date indicating you can return to work on 2/29/01.

On 5/8/01, I reviewed your entire case with our KNS physician. It is documented that you were last seen by your pri supports as well as frequent breaks. Therefore,

6

> the current available records document that you are able to return to work in a sedentary light duty position with the restrictions of avoiding repetative [sic] activities to the upper extremities and obtaining the appropriate adaptive devices. It is also noted that the prior Functional Capacity Evaluation did not demonstrate findings that would preclude you from working in any occupation.
>
> Your physicians have not given us sufficient objective medical data to support your being "disabled" from any type of work. These terms are defined in Section 2 of the BellSouth Short Term Disability Plan, as follows: "Disability" means a medical condition which makes a Participant unable to perform any type of work as a result of a physical or mental illness or an accidental injury. 'Any type of work' includes the Participant's regular job with or without accommodations, any other Participating Company job (regardless of availability) with or without accommodations, or temporary modified duties. 'A Participating Company job' is any job within a Participating Company; or any job outside a Participating Company, which is comparable in skills and functions. A Participant subject to a Disability is referred to as being "Disabled".
>
> Therefore, your short-term disability benefits remain denied effective 2/9/01.

(*Id.* at 0121-23).

The plaintiff's counsel sought a second review of the denial of benefits. (*Id.* at 0125).

On July 26, 2001, Dr. Holden sent a letter to Kemper, stating, in part, that the plaintiff was seen on June 9, 2001. His evaluation was as follows:

> [Patient] continues to do poorly with pain involving her low back left leg wrists hands knees [and] ankles. [She] has difficulty sitting more than ½ hour w/o changing positions. Despite meds has pain with repeatative [sic] motion. Insomnia. Diffuse tenderness over L Paralumbar region swelling of the MCP wrists ankles. Not responding well to meds. No[t] capable of carrying on productive work.

(*Id.* at 0126). The Kemper representative noted, "Recognize medical data does not support a disability[.] Forwarded to appeals." (*Id.*).

Kemper denied the plaintiff's second level appeal on September 10, 2001. (*Id.* at 0126-27). In a letter to the plaintiff's counsel, Kemper stated, in pertinent part:

7

> On 7/13/01, you filed a request for a second level appeal of our original decision and denial effective 2/9/01.
>
> The Appeal Review Committee has conducted an extensive re-examination of the medical evidence in your client's file. In conducting it's review, the medical evidence received from your client's physicians, Dr. Holden, Dr. Pugliese, The Rehab Center, Gadsden Regional Medical Center, Dr. Henderson, Dr. Jagadeesan [sic], and our KNS physicians was re-examined. This review included all medical information submitted with your 2nd level appeal request. Since our original decision was rendered, you have failed to submit any new evidence that would support a change in our previous decision.
>
> The medical information provided does not support your being "disabled" from any type of work. These terms are defined in Section 2 of the BellSouth Short Term Disability Plan, as follows: "Disability" means a medical condition, which (i) makes a Participant unable to perform any type of work as a result of a physical or mental illness or an accidental injury or (ii) results in a Participant receiving treatment that qualifies as a Chemical Dependency Confinement. "Any type of work" includesr [sic] such confinement for which an appeal is depending and has not been ultimately determined in accordance with the claims and appeals provisions of the Plan) and which is approved by or covered under the applicable BellSouth or Affiliate sponsored group health plan covering the Participant (or would be approved by or covered under such applicable group health plan if the Participant had not waived such coverage). A participant subject to a Disability is referred to as being "Disabled." Based on this review, our decision to deny benefits effective 2/9/01 is upheld. According to Section 6.6 of the BellSouth Short Term Disability Plan, Final Authority: The Appeal Committee has complete discretionary authority to determine Benefits and to interpret the terms and provisions of the Plan. Such determinations and interpretations shall be final and conclusive.

(*Id.* at 0127-28). BellSouth was informed of the continued denial of benefits. (*Id.*).

In a September 26, 2001 letter, Dr. Holden apprized the plaintiff's counsel of her most recent visit. The assessment section of that letter provides as follows:

> Rheumatoid arthritis with objective evidence. Methotrexate pneumonitis. Low back pain likely on bases of degenerative arthritis. A Functional capacity was done February 17th, 2001 which recommended the following modifications[:] reduced lifting, repetitive squats. Limitation of elevated work forward bending. Unfortunately, instead of working with her at work she had her work terminated.

8

> Subjectively her pain level is at 7 to 8 out of 10. Objectively has progressed with her rheumatoid arthritis and lumbar back pain. . . .

(BST at 0043).

The plaintiff is presently receiving Social Security benefits premised upon her physical condition which is at issue in this litigation.

The parties agree that the Plans applicable in this action are controlled by the Employee Retirement Income Security Act (29 U.S.C. § 1001, et seq.) (hereinafter "ERISA").

### Plan Definitions

Kemper initially determines eligibility for benefits premised upon the definition of a disability as provided in the STD Plan. It provides:

> "Disability" means a medical condition which makes a Participant unable to perform any type of work as a result of a physical or mental illness or an accidental injury. "Any type of work" includes the Participant's regular job with or without accommodations, any other Participating Company job (regardless of availability) with or without accommodations, or temporary modified duties. "A Participating Company job" is any job within a Participating Company; or any job outside a Participating Company which is comparable in skills and functions. A Participant subject to a Disability is referred to as being "Disabled."

(Ex. 3 at 3123). The LTD Plan defines a disability as "a physical or mental illness, whether work-related or non-work related, which makes a Participant who has been covered under the Short Term Disability Plan for 52 weeks unable to perform any type of work other than one which pays less than half of his base pay at the time his benefits under the Short Term Disability Plan begin." (Ex. 5 at 3147).

### STANDARD OF REVIEW

The Eleventh Circuit Court of Appeals recently addressed the issue of the appropriate standard of review in ERISA cases involving situations such as the present one where BellSouth

is the administrator and Kemper is the claim administrator. The Court held that the "heightened standard of review" for ERISA cases is applicable. It further "recapitulate[d]" the review procedure as follows:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); [ ] if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "*de novo* wrong," [ ] then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds [ ] supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.
>
> (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Williams v. BellSouth Telecommunications, Inc.*, 2004 WL 1336858, at *5 (11th Cir. 2004).

## DISCUSSION

### Was the Decision Wrong?

The initial question before the court is whether Kemper's decision to deny the plaintiff benefits is wrong. *Williams*, 2004 WL 1336858, at *5. The defendants argue that the plaintiff's claim was properly denied premised on the record. The plaintiff counters that the determination is erroneous because it fails to consider all the evidence and instead is premised on only limited

objective evidence.

At the outset, the court finds that the plaintiff is correct in her assertion that the court must consider all the information before the defendants at the time of the relevant decision. This includes subjective and objective information and all the pertinent medical opinions. However, the court finds that it cannot consider the Social Security determination of the administrative law judge for a number of reasons. First, the standards and considerations in each determination are not the same. The question of whether the plaintiff is entitled to STD and LTD benefits are matters of Plan interpretation, not application of Social Security law and definitions. Second, the Social Security Administration did not render its decision in the plaintiff's situation until December 4, 2002, over one year after Kemper made its determination. (Ex. 17, Decision). *See Jett v. Blue Cross and Blue Shield*, 890 F.2d 1137, 1139 (1989) (the court is to review "the facts as known to the administrator at the time the decision was made"). Third, the evidence before the two decision-makers, Kemper and the administrative law judge, were not the same. This is evidenced in the fact that the Social Security record includes medical records related to various conditions experienced by the plaintiff following Kemper's determination.

During the hearing on the merits, the plaintiff relied on the medical evidence adduced from her treating physicians, particularly Dr. Holden, and the IME done by Dr. Henderson to challenge Kemper's decision. These records, along with other information, were reviewed by Kemper in making its decision. Unlike the medical records in the *Williams* decision that failed to indicate that she "was completely incapable of working," Ms. Washington asserts that the records in this case show that she was disabled.

In examining this first issue, the question is not as straight-forward as asserted by the

plaintiff. The correct issue is whether she had a disability as that term is defined under the applicable STD Plan.[7]

Reviewing the records in chronological order, the court will begin with Dr. Holden's "Physician Report," dated February 9, 2001. The report[8] unequivocally states that the plaintiff was unable to work. (BST at 0053). It did not, however, articulate any reasoning in support of the conclusory statement.[9]

Shortly after Holden's report, on February 14-15, 2001, the plaintiff underwent a FCE. During the FCE, she reported numerous difficulties, including that her "'[l]eft arm gets numb and goes out on me.'" (Ex. 17, FCE Report at ¶ 30).[10] However, she also stated that "this is not all the time and doesn't last very long at a time." (*Id.*). She also stated that her husband had to help her shower and she has difficulty getting "off the toilet." (*Id.*). She further stated that she had a decrease in her ability to participate in household activities and she could slowly dress herself. (*Id.*). She also noted her goals during the evaluation. They included that she "want[ed] to be able to function. To get around with minimal pain and to function normally. I may have to go on disability, but I don't want to." (*Id.* at ¶ 32). The FCE analyst also noted that the "Client reports that due to increased absences from work, discharge or suspension from work is pending. This FCE was ordered to determine the client's functional ability. Client reportedly debating applying

---

[7] Because of the court's finding below that the plaintiff does not have a "disability" as that term is defined by the STD Plan, the court need not examine the applicability of the LTD Plan definition of a "disability."

[8] The report is a standard Kemper form.

[9] The statement was made in response to questions on the form inquiring whether the plaintiff was able to work full time or with restrictions. Dr. Holden checked both inquiries "No."

[10] This report is located in the medical records in the Social Security portion of the record at exhibit 17. Although the court is not using the social security determination in this review for the reasons stated previously, the court has examined the relevant medical records to the extent they were referenced in the Kemper determination.

for disability." (*Id*. at ¶ 29). The report concluded with the recommendation that the plaintiff "[r]eturn to work in the **SEDENTARY TO LIGHT CAPACITY** within the limits definced [sic] in th[e] FCE." (*Id*. at Section One Recommendations) (bold and caps in original).

The March 23, 2001, IME of Dr. Henderson, which was requested by Kemper, did not conclude that the plaintiff could not work at all. It stated, that it was not believed that she could work more than two or three hours a day at that time. (BST at 0114). It did state that "she is unable to work even a part time job which require the use of her hands."[11] (*Id*.).

The April 2001 review of the plaintiff's condition by Dr. Superfne also did not conclude that the plaintiff could not work at all. He stated that she would be able to preform some occupation at BellSouth, however, "she would be restricted from utilizing her hands for fine motor movements." (*Id*. at 0115). Within two months of Superfine's review, Dr. Holden prepared a letter on June 9, 2001, stating, in part, that the plaintiff was "not capable [of] carrying on productive work." (*Id*. at 0174). His conclusory statement was not supported by any data, analysis, or supporting information.

The plaintiff's counsel correctly stated at the hearing that in a September 26, 2001 letter, Dr. Holden noted that her pain level was "7 to 8 out of 10" at that point. (BST at 0043). However, that same letter also states that BellSouth failed to work with the plaintiff and his (Holden's) recommendations following the February 2001 FCE. (*Id*.). Consistent with this statement, Dr. Holden stated in his "Attending Physician Statement" of March 20, 2001, that the

---

[11] See page three herein for a full recitation of the "Overview" by Dr. Henderson. In the "Recommendation" section, Henderson wrote that "with the degree of synovitis it is felt that she would not be able to perform frequent hand motions such as typing and counting papers, etc., without significant pain and also worsening of flare of her rheumatoid arthritis." (BST at 0113).

plaintiff's work status was "Released with Temporary Accommodations/Restrictions."[12] (*Id.* at 0067).

Additionally, the plaintiff's medical records show that there have been various periods during her struggle with her arthritis that she has been off work for appreciable periods that were followed by doctors' recommendations that she return to work. (*See, e.g.,* Ex. 17, J. Michael Grelier, M.D., letter dated May 20, 1998; BST 0266-67 (Alderson, M.D., letter dated November 1999 (discussing migraine headaches)).[13] The court notes also that the medical records for 2002 also show a deterioration in her overall medical condition. (*See, e.g.,* Ex. 17, Huma Khusro, M.D., report dated March 18, 2002).[14]

In resolving this issue, the court must apply the definition of a "disability" under the STD Plan to the plaintiff's situation to determine whether the decision to deny her benefits was *de novo* wrong. As stated previously, the Plan provides as follows:

> "Disability" means a medical condition which makes a Participant unable to perform any type of work as a result of a physical or mental illness or an accidental injury. "Any type of work" includes the Participant's regular job with or without accommodations, any other Participating Company job (regardless of availability) with or without accommodations, or temporary modified duties. "A Participating Company job" is any job within a Participating Company; or any job outside a Participating Company which is comparable in skills and functions. A Participant subject to a Disability is referred to as being "Disabled."

(BST at 3123).

---

[12] Dr. Thomas Pugliese's "Attending Physician Statement" dated February 29, 2001, also provides that the plaintiff's work status was "Released Full Duty." (*Id.* at 0065).

[13] There is no evidence that all of the medical records from the Social Security determination were presented to Kemper. To the contrary, many of the records were generated following the determinations at issue in this case.

[14] In part, this report notes that the plaintiff's depression was worsened following her termination and due to other issues involving her husband. (Ex. 17, Huma Khusro, M.D., report dated March 18, 2002).

Reviewing the evidence in the record that was before Kemper in light of this definition, the court cannot conclude that Kemper's no-disability determination was *de novo* wrong. Kemper sought out and received relevant information and records concerning the plaintiff's condition. Various tests, evaluations, and consultations were conducted. The evidence is adequate to contradict the plaintiff's claim that she was unable to perform "'any kind of work' as required for disability benefits under the BellSouth Plan." *Williams*, 2004 WL 1336858, at *7. The February 2001 FCE found that she could work in a limited capacity, Henderson's IME indicated she could do limited work, and Superfine stated that her condition would not allow her to work more than two or three hours per day at that time.

A fair amount of the evidence contradicting the plaintiff's claim that she was disabled comes from the plaintiff's doctor. Holden's "Physician Statement" states she was released to work on March 20, 2001, with "temporary accommodations/restrictions." (BST at 0067). His statement in the September 26, 2001 letter that BellSouth failed to work with her also tends to support the conclusion that the plaintiff could perform some type of work.[15] Therefore, she was not disabled as that term is defined by the policy.

The court does not find Holden's conclusory statement in the June letter that the plaintiff could not work sufficient to support a finding that Kemper's decision is *de novo* wrong. Similarly, his statement in the September 26, 2001 letter that her pain level was "7 to 8 out of 10" is not alone sufficient to find for the plaintiff.

By concluding that the plaintiff has not met her burden in this matter, the court is not

---

[15] At the summary judgment stage, the court stated that the "last sentence [in the assessment] could be construed to mean that Dr. Holden believed that she was able to work. However, to reach such a conclusion, the court would have to construe the evidence in a light most favorable to the defendants, something it cannot do on a motion for summary judgment. At this juncture, the court must give appropriate weight to the statement.

15

suggesting that she does not have significant medical difficulties. To the contrary, the court simply concludes that she has not met the applicable definition in the policy. The court is convinced that she is disabled in the general sense. However, she is not disabled under the strict definition that this court must apply and follow in reviewing Kemper's application of the STD Plan. The fact that she was later deemed disabled by the Social Security Administration does not change that conclusion.[16]

Because the court finds that no grounds exist to disturb Kemper's STD Plan determination under the *de novo* review standard, the plaintiff's request for long term benefits under the LTD Plan is due to be denied as well.[17] The court has no authority to grant such benefits under the present circumstances.

## CONCLUSION

Premised on the foregoing, the court finds that judgment is due to be entered in favor of the defendants and against the plaintiff. An appropriate order will be entered.

DONE, this the 30th day of July, 2004.

JOHN E. OTT
United States Magistrate Judge

---

[16] In reaching its determination, the court has considered all the allowable evidence, whether subjective or objective.

[17] The plaintiff did not met the 52 week STD Plan requirement imposed by the LTD Plan.